UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| AMELIA SALTERS, f/k/a Amelia Woods, | ) | Civil Action No.: 4:14-cv-2435-BHH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | **)** | **REPORT AND RECOMMENDATION** |
| CONDOLUX, INC.; CONDOLUX | ) | |
| PROPERTIES, LLC; and CONDOLUX | ) | |
| SALES & DEVELOPMENT, LLC; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964 (Title VII),

42 U.S.C. § 2000(e) et seq., alleging that Defendants harassed and discriminated against her because

of her race and retaliated against her for engaging in protected activity.  She also raises state law

claims for breach of contract and violation of the South Carolina Payment of Wages Act (SCPWA),

S.C. Code Ann. § 41-10-10, et seq.  Presently before the court is Defendants' Motion for Summary

Judgment (Document # 50).  All pretrial proceedings in this case were referred to the undersigned

pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.

This report and recommendation is entered for review by the district judge.

## II.    FACTS

Condolux, Inc. is a property management and reservation company, and Condolux Properties,

LLC, is a real estate company, both of which are owned by Evelyn Brown.  S. Brown Dep. 14 (Ex.

B to Pl. Resp.).  Her son, Stewart Brown, is the Vice President and Director of Operations for both

entities.[1]  S. Brown Dep. 19-20.  He has the power to hire and fire employees at both entities.  S.

---

[1]Stewart Brown testified that Condolux Properties, LLC was formed in 2013, and the other
named Defendant, Condolux Sales & Development, LLC, is no longer in existence and has not

Brown Dep. 29, 36.

Plaintiff, an African-American female, was hired in May of 2010 as a reservations agent for Condolux, Inc.  S. Brown Dep. 63, 69.  At the time of her hire, Plaintiff was the only African-American in her department; the only other African-Americans that worked for Condolux, Inc. worked in the housekeeping department.  S. Brown Dep. 52.  Stewart testified that Plaintiff was an average employee who was good at reservations.  S. Brown Dep. 80-81.  She never received any written warnings because Defendant had not implemented a written warning system at the time Plaintiff was employed.  S. Brown Dep. 75-76.  However, Stewart verbally counseled Plaintiff for giving false information to a new employee on one occasion and for using her personal email address to correspond with guests, which was against company policy, on several occasions.  S. Brown Dep. 76-78.[2]

Plaintiff testified that she could not remember exactly when she first complained to Stewart about racial discrimination, but it was approximately five or six months after she started working.  Pl. Dep. 48 (Ex. B to Def. Motion).  She testified that she met with him on ten or more occasions,

---

been for approximately ten years.  S. Brown Dep. 16, 17-18.  He testified that Condolux Sales and Development , LLC has no employees or bank accounts.  S. Brown Dep. 18.  Although Plaintiff makes an integrated employer argument with respect to these two Defendants, "for the purposes of determining whether an adequate number of persons are employed to invoke Title VII, Pl. Resp. 18, Stewart testified to having approximately 30 employees with Condolux, Inc.  S. Brown Dep. 23.  Under Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C.A. §  2000e(b).  Therefore, Condolux, Inc. alone has enough employees to invoke Title VII.

[2]Stewart mentioned two other, small instances when he had to counsel Plaintiff about inappropriate conduct.  Plaintiff asked for a company loan for a car payment, and when that was denied, she asked for a pay advance, which was also denied.  Stewart testified that the company did not give loans or pay advances to any of its employees and Plaintiff "was a little more confrontational than an employee should be about a refusal to forward money."  S. Brown Dep. 78-79.  Stewart also had to counsel Plaintiff not to sign her emails to guests as "love, Amelia."  S. Brown Dep. 81.

three or four times a week. Pl. Dep. 44-45, 49.[3] Plaintiff testified that her co-workers, Terry, Sherry, Hannah, and Diane, would shout at her and call her "nigger" and say things like "let the maid make the coffee." Pl. Dep. 43-44. She testified that Stewart's office was close enough to hear these comments made by Plaintiff's co-workers, and that he admitted to her that he had heard the comments when she would discuss the issues with him. Pl. Dep. 44.

However, Stewart testified that Plaintiff never complained to him that she felt she was being harassed or discriminated against or otherwise treated differently because of her race. S. Brown Dep. 82-83, 101. Stewart testified that Plaintiff often came to his office to talk to him about being shy and feeling like an outsider from the others in the office, but it never had any relation to race. S. Brown Dep. 101-02. He testified that the only differences about which Plaintiff spoke were differences in interests, such as sports or cooking. S. Brown Dep. 116.

On November 16, 2011, Plaintiff wrote a letter and gave it to Evelyn Brown, documenting complaints she had regarding the treatment she was receiving from coworkers and supervisors. Pl. Letter (Ex. C to Pl. Resp.). At the beginning of the letter, Plaintiff stated that she has been getting the most bonuses[4], which upset her coworkers and resulted in hostility towards her. Pl. Statement. She raised numerous complaints in the letter:

- she cannot hold reservations or give company discounts while others can;

- Pam Fury asked her whether the credit card numbers she entered to hold reservations were accurate or fake;

---

[3]Plaintiff also testified that she talked with two of her coworkers, Eleanor and Donna Marie, about her treatment frequently. Pl. Dep. 49.

[4]Stewart testified that bonuses were "relatively rare, not a pretty regular occurrence," and they were offered by the owners of the condos, not Defendant. S. Brown Dep. 120-22.

-3-

- she is always criticized for small mistakes and her coworkers will discuss her mistakes where Plaintiff can hear them, even though they make mistakes as well and Plaintiff usually just fixes the mistakes for them;

- her coworkers are constantly searching through her reservations to find flaws;

- she is unsure whether she is supposed to answer the switchboard phone, because even though she was told by Stewart Brown and Pam Fury to answer the phone, her coworkers get upset if she does;

- "the supervisor" is biased and hears and sometimes participates in criticizing Plaintiff's work, and also has other coworkers tell Plaintiff what to do rather than telling Plaintiff herself;

- Ms. Linda was "throwing comments all around her" about a mistake that was actually made by someone else, and talked to Cindi Moore about it within Plaintiff's earshot; and

- Hannah complained to Plaintiff about a mistake she made by leaving a key tag on the board and Hannah printed out a memo regarding "proper procedures."

Pl. Letter.  Plaintiff ended the letter by stating "this is not a very good work environment because everyone around me is worrying about what I'm doing I have several women around me everyone harassing me, gossiping about me, and treating me badly, etc.  This environment is very unprofessional, and hostile."  Pl. Letter.

Plaintiff testified that, when she gave the letter to Evelyn Brown, she told her that she thought her coworkers were treating her poorly because she was black.  Pl. Dep 40.  She testified that she told Evelyn she did not want to put it on paper, but they were calling her nigger four or five times a week.  Pl. Dep. 40.  Plaintiff also kept notes at the suggestion of one of her coworkers, Eleanor,

in which she documented the treatment she was receiving from her coworkers.  Pl. Dep. 45-46.[5]  On November 14, 2011, Plaintiff noted that she "had her meeting with Evelyn Brown."[6]  Pl. Handwritten Notes.  She noted several things she told Evelyn, including her coworkers  "calling me a nigger or stupid every chance they get."  Pl. Handwritten Notes.  She also wrote, "Evelyn ask me why they were doing these things.  I said, I said [sic] they are Intimidate [sic] and racists."  Pl. Handwritten Notes.  In another noted dated November 14, Plaintiff wrote "after meeting I'm sitting at my desk and Mrs. Linda still not [sic] transfer calls.  She looks at me and say [sic] the nigger will not get a call today. . . . Mrs. Linda says she will be glad when they get rid of that nigger."  Pl. Handwritten Notes.  In a note dated November 16, 2011, Plaintiff wrote "Carolyn Martinez, the head of housekeeping, calls me outside and says 'Evelyn thinks you are crazy for writing her a letter complaining about racial discrimination and hostility in the environment, because you should ignore people screaming at you and complaining about your work and making racial slurs because they don't cut your paycheck."  Carolyn says they never [sic] work with a black person before."  Pl. Handwritten Notes.

After meeting with Plaintiff, Evelyn called Stewart, who was out of town at the time, to inform him of Plaintiff's concerns and ask him to investigate her claims of hostility from Plaintiff's coworkers.  S. Brown Dep. 84-85.  Stewart testified that Evelyn did not tell Stewart that Plaintiff made any race-related complaints.  S. Brown Dep. 87-88.

Stewart first investigated Plaintiff's claims by reviewing audio and video footage from the

---

[5]During Plaintiff's deposition, counsel for Defendant indicated that he had received "a little over 2000 pages of documents" from Plaintiff.  Pl. Dep. 45.  Only a handful of Plaintiff's handwritten notes are in the record before the court.

[6]The letter Plaintiff claims she gave to Evelyn during this meeting is dated November 16, 2011.  Pl. Letter.

security cameras that are located throughout Defendant's building.  S. Brown Dep. 86.  He testified

that he did not see any occurrences that appeared to be "anywhere remotely close to what [Plaintiff]

was describing."  S. Brown Dep. 86.  When Stewart returned to the office, he spoke with Plaintiff

about her complaints.  S. Brown Dep. 86.  He testified that

> it was almost like a different personality.  It–she said that she just felt silly and alone,
> and when the rest of the people were still friends with each other outside of the office
> and they were able to go socialize and go to have lunch together and stuff like that,
> that she didn't have any friends at work. . . . The personality that I was speaking to
> afterwards almost seemed as though she felt like she had jumped the gun, like maybe
> she had caused too much attention–drawn too much attention to everybody else and
> didn't want to create a scene, so to speak.

S. Brown Dep. 86-87.  Plaintiff testified that after she complained, the treatment got worse.  Pl. Dep.

52.

Just prior to her termination in late March of 2012, Plaintiff failed to appear for work, but

called and left a message that she would not be coming to work.  S. Brown Dep. 91-93, 124-25.

From what Stewart could recall during his deposition, the reason for Plaintiff's absence on that day

was due to car troubles.  S. Brown Dep. 125.  The next day, Plaintiff was again absent from work

but did not call to inform anyone that she would not be there.  S. Brown Dep. 91-93.  Stewart

testified that, if an employee was going to be absent from work, they would have to notify him that

they were not coming.  S. Brown Dep.  If an employee failed to show up for work and did not call

or did not answer his calls, "that's grounds for dismissal. . . . Failure to notify was immediate

grounds for dismissal."  S. Brown Dep. 49-50.  He testified that there has never been an incident

where an employee failed to notify him that he was going to be absent from work but was not fired.

S. Brown Dep. 123-24.  Stewart testified that he made the decision to fire Plaintiff for her absence

from work and her failure to notify them of her absence on the evening of the second day she was

absent, sometime between 5:00 and 8:00, and he informed Evelyn of his decision that same night.

S. Brown Dep. 102-03. In an affidavit signed subsequent to his deposition, Stewart listed additional reasons for Plaintiff's termination:

- Her inappropriate and unsatisfactory attitude towards her job duties and position responsibilities;

- Displays of contentious behavior toward fellow employees, supervisors, and owners of Condolux, Inc.;

- Absenteeism and repeated unexcused absences;

- Failure to work her designated schedule;

- Erratic behavior;

- Willful disregard for the professional interests of Condolux;

- Increasing number of errors that led to unacceptable work product and failure to accept constructive criticism when addressed with her;

- Failure to follow Condolux, Inc. identity theft prevention procedures by funneling reservation inquiries and confirmations, including credit card numbers and mailing addresses, in a non-secure, unencrypted fashion. As a result of her actions, customer database containing valuable intellectual property of Condolux, Inc. was at risk.

S. Brown Aff. ¶ 5 (Ex. C to Def. Motion).

Plaintiff and Stewart have differing recollections as to what occurred on the day that Plaintiff was terminated, March 28, 2012. Plaintiff returned to work that day after being absent for two days. S. Brown Dep. 91-93. Plaintiff testified that on the morning of March 28, 2012, she hand-delivered[7] a memo to "all upper management"– Evelyn, Pam, Sherry, Terry, and Stewart. Pl. Dep. 53. The

---

[7]Plaintiff testified that she physically handed the memo to everyone except Evelyn, whose copy she gave to Pam. Pl. Dep. 53.

memo included the subject line "Illegal Racial Discrimination and Harassment and Retaliation." Pl. Memo (Ex. D. to Pl. Resp.). In the memo, Plaintiff stated that she believed she was being illegally discriminated against and harassed by her supervisor, Terry Seidlitz, because of her race. Pl. Memo. She stated that she was the only African-American employee at Condolux, and she believed that she was being retaliated against for previously complaining of Terry Seidlitz's racial discrimination. Pl. Memo. She stated that Terry Seidlitz and Linda Zierk had both referred to her with racial slurs and made highly inappropriate comments directly to her regarding her race, and that her coworkers, Hannah Roof, Sherry Graves, Carol Guerra, Carolyn Martinez and Sherry Watkins had also discriminated against her and harassed her. Pl. Memo. She stated that nothing has been done about the discrimination and harassment since she previously complained and that the "retaliation" had gotten worse. Pl. Memo. Plaintiff stated that she was afraid Terry Seidlitz was setting her up to be fired. Pl Memo.

In the same memo, Plaintiff also complained that she was finally given a pay raise and the option to obtain health insurance in January of 2012, and thereafter, Linda Zierk subjected her to "a particularly extreme incident of racial harassment." Pl. Memo. In addition, her pay increase and benefits were removed from her next pay check and all of the following pay checks. Pl. Memo. Plaintiff also noted that she had not received a booking bonus that she should have received in September of 2011. Pl. Memo. Plaintiff threatened to file an unpaid wages complaint with the South Carolina Department of Labor, Licensing and Regulation if the unpaid wages were not paid immediately. Pl. Memo.

Plaintiff testified that after she delivered the memo, Terry came to her desk and told her she was fired. Pl. Dep. 56. When Plaintiff asked why, Terry told her "because Stewart said so." Pl. Dep. 56. Plaintiff testified that she never received a reason for her termination. Pl. Dep. 58.

Stewart testified that he never received his own copy of the memo. S. Brown Dep. 94-59. He testified that he arrived to work around 11:00 a.m. on March 28, 2012, at which time he began looking for Plaintiff to inform her of her termination. S. Brown Dep. 99. He found her after she returned from lunch around noon as she was coming back down to her desk from Evelyn's office. S. Brown Dep. 99-100, 129. He testified that he pulled her into his office, shut the door, and informed her that she was fired. S. Brown Dep. 100. When she asked why, he told her that she did not give him an excuse for being absent and that she had violated too many of their identify theft protection policies. S. Brown Dep. 100-01. Stewart testified that he did not share with anyone other than Evelyn that he had decided to fire Plaintiff until after her termination because "any time I'm letting another employee go, it's really not the business of another employee." S. Brown Dep. 122-23. He testified that Terry was not in the room when he notified Plaintiff of her termination. S. Brown Dep. 128.

Stewart testified that he had not seen Plaintiff's memo at the time he notified her of her termination, nor had anyone told him about the memo, nor did Plaintiff mention the memo to him. S. Brown Dep. 101, 127, 130. Stewart testified that, later in the day, around 2:00 or 3:00 in the afternoon, Evelyn contacted Stewart and told him that she had received a letter from Plaintiff but had not yet read it. S. Brown Dep. 96. She asked Stewart if he had fired Plaintiff yet, and he said he had. S. Brown Dep. 96. Stewart told Evelyn he was tired of dealing with Plaintiff and would read the letter later. S. Brown Dep. 96-97. Stewart testified that he and Evelyn read the letter sometime after he fired Plaintiff. S. Brown Dep. 97. Stewart testified that he was shocked when he read the letter because in the amount of time that Plaintiff had worked for him and for the number of times he had talked with Plaintiff, the issues Plaintiff raised in the letter had never surfaced. S. Brown Dep. 116. The only issues Plaintiff ever raised with Stewart were things such as not having the same interests

as her coworkers–"you know, not being into the same things, you know, maybe somebody's into sports and she's into, you know, watching cooking TV shows or something like that."  S. Brown Dep. 116.  Stewart testified that there had never been issues of discrimination in the office, and so he felt offended when he read Plaintiff's letter.  S. Brown Dep. 116.

Plaintiff subsequently filed for unemployment benefits, which Defendant opposed.  S. Brown Dep. 116-17.  Plaintiff also filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the South Carolina Human Affairs Commission (SCHAC) on April 13, 2012, alleging discrimination based on race and retaliation as a result of her complaints of discrimination.  Charge of Discrimination (Ex.  Plaintiff received a notice of her right to sue from the EEOC on April 24, 2014.  Notice of Right to Sue (Ex. A to Def. Motion).  She filed the present action on June 18, 2014.

## III.    STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Hostile Work Environment

In her complaint, Plaintiff alleges that she suffered harassment in a hostile work environment based upon her race.  Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1).  "An employer contravenes § 2000e-2(a)(1) by, inter alia, requiring an African-American employee to

-11-

work in a racially hostile environment." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).   Thus, to establish a hostile work environment claim based upon race, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's ... race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir.2011) (internal quotation marks omitted).

Defendant argues that Plaintiff fails to present evidence sufficient to create an issue of fact as to the third and fourth elements of a hostile work environment claim.  "Element three of a hostile work environment claim requires a showing that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'" Boyer-Liberto, 786 F.3d at 277 (citing Harris v. Forklift Systems. Inc., 510 U.S. 17, 22 (1993)).   Title VII is not a "general civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe and pervasive standard." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir.2008).  The Fourth Circuit has established a four factor approach to evaluate the totality of the circumstances in determining whether conduct is severe or pervasive: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Connor v. Schrader Bridgeport Int'l, Inc., 227 F.3d 179, 193 (4th Cir.2000).  The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." Sunbelt Rentals, Inc., 521 F.3d at 315.

-12-

Plaintiff testified that her coworkers yelled and shouted at her and called her "nigger" four and five times out of the week. Pl. Dep. 40, 44. As set forth above, in addition to her deposition testimony regarding the racial slurs used by her coworkers, Plaintiff also produced handwritten documentation contemporaneous with the events at issue, in which she makes note of the racial slurs and other harassment used against her. See Pl. Handwritten Notes (Exhibits to Pl. Dep. attached to Def. Motion). Plaintiff testified that she kept these notes at the suggestion of one of her coworkers, Eleanor, and that she would jot down the date and a description of things that happened. Pl. Dep. 45-46. On November 14, 2011, Plaintiff noted that she "had her meeting with Evelyn Brown."[8] Pl. Handwritten Notes. She noted several things she told Evelyn, including "calling me a nigger or stupid every chance they get." Pl. Handwritten Notes. She also wrote, "Evelyn ask me why they were doing these things. I said, I said [sic] they are Intimidate [sic] and racists." Pl. Handwritten Notes. In another noted dated November 14, Plaintiff wrote "after meeting I'm sitting at my desk and Mrs. Linda still not [sic] transfer calls. She looks at me and say [sic] the nigger will not get a call today. . . . Mrs. Linda says she will be glad when they get rid of that nigger." Pl. Handwritten Notes. In a note dated November 16, 2011, Plaintiff wrote "Carolyn Martinez, the head of housekeeping, calls me outside and says 'Evelyn thinks you are crazy for writing her a letter complaining about racial discrimination and hostility in the environment, because you should ignore people screaming at you and complaining about your work and making racial slurs because they don't cut your paycheck." Carolyn says they never [sic] work with a black person before." Pl. Handwritten Notes. In addition to using racial slurs, Plaintiff's coworkers also scrutinized and criticized her work, refused to transfer calls to her that would enable her to make reservations, and

---

[8]The letter Plaintiff claims she gave to Evelyn during this meeting is dated November 16, 2011. Pl. Letter.

even canceled reservations she had put on hold.  Pl. Letter; Pl. Memo; Pl. Handwritten Notes.

Viewing the evidence in the record in the light most favorable to Plaintiff, she was subjected to yelling, shouting, and the use racial slurs such as the "unambiguous racial epithet," Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001), "nigger" as often as four to five times a week.   Where such an abhorrent slur is alleged, there is no question that its use was offensive, unwelcome, and racially motivated. Shields v. Fed. Exp. Corp., 120 Fed.Appx. 956, 961 (4th Cir.2005) (unpublished) (per curiam). Thus, the relevant question becomes whether the use of racial epithets "so pervaded the work environment ... that it was essentially transformed into an atmosphere tinged with racial hostility and altered the conditions of [plaintiff's] employment." Id.  The evidence in this case does not reveal isolated, discrete uses of this word, but repeated use.  See  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct ... [s]uch claims are based on the cumulative effect of individual acts."). "We cannot ignore . . . the habitual use of epithets here or view the conduct without an eye for its cumulative effect. Our precedent has made this point repeatedly." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 318 (4th Cir. 2008).  Further, the coworkers' hostility toward Plaintiff interfered with her work performance because, aside from humiliating Plaintiff, they refused to transfer calls to her to allow her to make reservations, and even canceled reservations she had made that had been put on hold.

Defendant argues that Plaintiff "has failed to produce any witnesses, documents or other evidence to support a prima facie showing of racial harassment" and "has simply made allegations in her Complaint without any specific instances to include dates, times, or events to support her claim for racial harassment."  Def. Mem. 6, 7.  However, the record evidence includes her own deposition testimony, the two letters she submitted to Evelyn Brown and her handwritten,

contemporaneous notes taken at the time of the events about which she complains.  It is not the court's responsibility to determine the credibility of Plaintiff's evidence, but to decide whether reasonable jurors could find in favor of Plaintiff if they believe the evidence she presents.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Therefore, Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether her work environment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment.

However, Plaintiff must also present sufficient evidence to show that the conduct is imputable to her employer.   "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Vance v. Ball State Univ., ——— U.S. ———, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333–34 (4th Cir.2003) (en banc) ("[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it.").  Where the harasser is the victim's supervisor, "different rules apply": The employer is strictly liable for the supervisor's harassing behavior if it "culminates in a tangible employment action," but otherwise "may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Vance, 133 S.Ct. at 2439 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Plaintiff asserts that her harassers included Terry, Sherry, Hannah, and Diane, whom she described at one point in her deposition as "coworkers."  Pl. Dep. 43.  However, she later testified

that Terry was her supervisor.  Pl. Dep. 51.  Stewart, on the other hand, testified that Terry was the senior reservations agent and that she trained Plaintiff on the reservations system but otherwise did not qualify as any type of supervisor.  S. Brown Dep. 70, 74.  Stewart testified that the decision to fire Plaintiff was "entirely [his] call" and no one else had any input in that decision or otherwise made any recommendation regarding Plaintiff's termination.  S. Brown Dep. 88.  He further testified that it was him, not Terry, who informed Plaintiff that she was fired.  S. Brown Dep. 88.  "For purposes of the employer's vicarious liability, the harasser qualifies as a supervisor, rather than a co-worker, 'if he or she is empowered by the employer to take tangible employment actions against the victim.'"  Boyer-Liberto, 786 F.3d at 278 (citing Vance, 133 S.Ct. at 2439).  There is no evidence in the record that Terry was empowered by Stewart or Evelyn to take any tangible employment actions against Plaintiff.  Even though Plaintiff testified that Terry informed her that she was fired, she stated that when she asked Terry why she was fired, Terry responded by saying "because Stewart said so."  Pl. Dep. 56.  Therefore, the evidence in the record is insufficient to establish that Terry was anything other than Plaintiff's coworker.  Plaintiff testified that she never heard Stewart use the "N" word.  Pl. Dep. 47.  Further, in an email written prior to her termination, Plaintiff stated that Stewart and Evelyn had never been anything but nice to her.  Email dated Feb. 11, 2012 (Ex. to Pl. Dep. attached to Def. Motion).  Therefore, because the alleged harassment suffered by Plaintiff was initiated by her coworkers, the issue before the court in determining whether the conduct is imputable to Defendant is whether Defendant "knew or should have known about the harassment and failed to take effective action to stop it."  Ocheltree, 335 F.3d at 333–34.

Plaintiff and Stewart dispute whether Stewart ever knew about Plaintiff's complaints of racial harassment.  Plaintiff testified that she spoke with Stewart about the racial harassment ten times or more prior to her termination, as often as three to four times a week.  Stewart testified that Plaintiff

often spoke to him about feeling out of place, but she never mentioned the harassing behavior or the racial slurs by her coworkers. Plaintiff also testified that Stewart told her he had overheard the harassment and, given the location of his office and the nature of the harassment–shouting and yelling–she testified that he would have been able to hear it from his office. Pl. Dep. 44. Further, it is undisputed that Plaintiff told Evelyn during her meeting with her in November of 2011 about the harassment she was enduring because she was black, including use by her coworkers of the word "nigger." A genuine dispute of material fact exists on this issue. Reasonable jurors could conclude that Plaintiff's employer was on notice of the harassment suffered by Plaintiff. Once the employer has notice, then it must respond with remedial action "reasonably calculated to end the harassment." Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131-32 (4th Cir.1995) ; see also Howard v. Winter, 446 F.3d 559, 570-71 (4th Cir.2006). The record does not reveal that any remedial action was taken that was reasonably calculated to end the harassment. Stewart testified that he investigated Plaintiff's complaints after her November 2011 meeting with Evelyn, although he stated that, to his knowledge, those complaints were not race-based. Nevertheless, it does not appear that any action was taken by Stewart other than investigating Plaintiff's complaints that could have ended the harassment. In fact, Plaintiff testified that the harassment got worse after she complained. Pl. Dep. 52.

In sum, for the reasons discussed above, genuine disputes of material facts exist as to whether Plaintiff suffered a racially hostile work environment that would be imputable to her employer. Therefore, summary judgment is not appropriate on Plaintiff's hostile work environment claim.

**B.    Retaliation**

Plaintiff also alleges in her complaint that Defendant retaliated against her for complaining of racial harassment. Title VII makes it an "unlawful employment practice for an employer to

discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). When direct evidence of retaliation is lacking, a plaintiff may proceed under the burden-shifting proof scheme established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a <u>prima</u> <u>facie</u> case of retaliation. <u>Id.</u> To establish a <u>prima</u> <u>facie</u> case of retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir.1985); <u>Laughlin v. Metropolitan Washington Airports Authority</u>, 149 F.3d 253, 258 (4th Cir.1998); <u>Causey v. Balog</u>, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a <u>prima</u> <u>facie</u> case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff must present evidence sufficient to create a genuine issue of material fact that Defendant's legitimate, non-retaliatory reason is pretextual. <u>See</u> <u>Matvia v. Bald Head Island Management</u>, 259 F.3d 261, 271 (4th Cir.2001).

It is undisputed that Plaintiff engaged in protected activity on March 28, 2012, when she gave the letter to Evelyn complaining that she was being discriminated against and harassed because of her race. In addition, viewing the evidence in the light most favorable to Plaintiff, she also engaged in protected activity when she complained to Stewart throughout her employment and to Evelyn in November of 2011 about the racial harassment she was enduring. Further, it is undisputed that she

suffered an adverse employment action when she was terminated.[9]  Defendant argues that Plaintiff fails to establish a prima facie case of retaliation because she fails to show a causal connection between her complaints of racial harassment and her termination.  However, the burden of showing a causal nexus is "not onerous."  Tex. Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); see also Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1229 (4th Cir.1998) (explaining that "little is required" to establish a causal connection).  "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity."  Price v. Thompson, 380 F.3d 209, 213 (4th Cir.2004). However, the temporal nexus between two events cannot provide proof of causation unless the "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" was "very close."  Clark County School District. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks omitted).  Plaintiff's first complaint to Evelyn in November of 2011, occurred approximately four months prior to her termination.  "Clark does not establish the outer boundaries for temporal proximity to be considered 'very close,' but it does cite examples of insufficient temporal proximity–evidence that the employer took the adverse action three or four months after the protected activity cannot alone establish causation."  Shields v. Fed. Exp. Corp., 120 F. App'x 956, 963 (4th Cir. 2005) (citing Clark, 532 U.S. at 273-74).

---

[9]Plaintiff also argues in her response that, following her complaint to Evelyn in November of 2011, she no longer received any overtime pay or bonuses.  Pl. Resp. 11-12.  However, in her complaint she alleges only that Defendant retaliated against her by terminating her employment after she complained of racial harassment.  Compl. ¶¶ 44-45.  Nevertheless, even if Plaintiff has properly pleaded this claim, as discussed in more detail below with respect to Plaintiff's state law claims, she fails to show that she was ever entitled to any bonuses or overtime pay.  Therefore, she cannot show that she suffered any adverse employment action following her complaint to Evelyn in November of 2011.

However, it is undisputed that when Plaintiff delivered her second written notice of racial harassment on March 28, 2012, to several people in her office, including Evelyn, the owner of the company, she was terminated the same day.  While this would certainly be "very close" in proximity, the question here is whether Stewart, the decisionmaker, had knowledge of the contents of the letter prior to Plaintiff's termination.  To establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity. Causey v. Balog, 162 F.3d 795, 803–04 (4th Cir.1998) (stating that "[k]nowledge of a charge is essential to a retaliation claim"); Dowe v. Total Action against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir.1998) (explaining that "[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.").  There is no evidence in the record that Stewart was aware of the contents of the letter Plaintiff put on his desk prior to her termination. Stewart testified that he made the decision to fire Plaintiff the day before he notified her of her termination, that he never received his own copy of Plaintiff's letter, and that he did not become aware of the contents of the letter until after he had fired Plaintiff.  When asked if she physically handed a copy of the letter to Stewart, Plaintiff testified that "he was at his desk.  I gave it – put it on his desk." Pl. Dep. 53.  However, aside from testifying that she placed the letter on Stewart's desk, Plaintiff fails to show that he actually read the letter before firing her.  Nevertheless, this court has previously found that a plaintiff need not meet such a high burden at the prima facie stage: "direct evidence" that a decisionmaker responsible for an adverse action was aware of the protected activity "is not required to establish a causal connection necessary for a prima facie case of retaliation."  King v. Marriott International, Inc., 2007 WL 951738, *7 (D.S.C. March 27, 2007)

(citing Ford v. Gen. Elect. Lighting, LLC, 121 Fed.App'x 1, *7, 2005 WL 32825, **5 (4th Cir. Jan. 7, 2005) (even without direct evidence of decisionmaker's knowledge of actual complaint, causal connection was established where supervisor knew of plaintiff's earlier informal complaints and adverse action occurred shortly after plaintiff made formal complaint). Viewing the evidence in the light most favorable to Plaintiff, reasonable jurors could find that Stewart had knowledge of Plaintiff's complaint of racial harassment prior to terminating her. "While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.1989).

Accordingly, the burden shifts to Defendant to produce a legitimate, non-retaliatory reason for Plaintiff's termination. In his deposition, Stewart details why he decided to fire Plaintiff. Plaintiff does not dispute that she was absent from work for two days prior to her termination and that she failed to call in to provide an excuse for her second day of absence. Stewart testified that, if an employee was going to be absent from work, they would have to notify him that they were not coming in. S. Brown Dep. If an employee failed to show up for work and did not call or did not answer his calls, "that's grounds for dismissal. . . . Failure to notify was immediate grounds for dismissal." S. Brown Dep. 49-50. He also testified that she had violated too many of Defendant's identify theft protection policies by using her personal email account to contact clients. S. Brown Dep. 100-01. Because Defendant has produced a legitimate reason for Plaintiff's termination, the burden returns to Plaintiff to present evidence that Defendant's reason for the termination is not the true reason but is pretext for a discriminatory reason.

As evidence of pretext, Plaintiff points to the closeness in time between the delivery of her letter complaining of racial harassment and her termination. In the light most favorable to Plaintiff, she

delivered a letter to Evelyn, Stewart and a few others complaining of racial harassment and, within a few hours, was fired. Of course, Stewart's testimony is vastly different from that of Plaintiff. Thus, construing the evidence as we must under Rule 56, an issue of fact exists as to whether Defendant fired Plaintiff in retaliation for her complaint of racial harassment. Therefore, summary judgment is not appropriate on Plaintiff's retaliation cause of action.

### C.     South Carolina Payment of Wages Act (SCPWA)

Plaintiff's third cause of action is for violation of the SCPWA, S.C. Code Ann. § 41-10-10, et seq. Plaintiff alleges that at the time of her termination, Defendant owed her wages in the form of bonuses totaling $2,000. SCPWA generally requires an employer to timely pay all wages due, including those wages due at the time the employee is discharged. S.C. Code Ann. §§ 41–10–40, 50. The SCPWA defines wages as "all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract." S.C. Code Ann. § 41-10-10(2). This definition of wages includes monthly payments by an employer to employee for meeting production quota as well as bonuses paid to employees for having the best monthly performance. Linder v. Paramount Acceptance Corp., 291 S.C. 539, 354 S.E.2d 567 (Ct. App. 1987). In support of this claim, Plaintiff submits two memoranda from Terry. Bonus Memos (Ex. E to Pl. Response). The first memo is dated January 14, 2012, which states: "The phone calls are picking up so this is our time to focus on reservations. Our efforts will be rewarded with a nice bonus in April. This is not a competition. We will all receive an equal bonus." Bonus Memos. The second memo, with a handwritten date of March 17, 2012, states that "[t]he owners of Ocean Blvd Villas 201 and Pier Watch 104 (The Eplings) are giving a $200 bonus to the reservationists who book the most

reservations in each unit this summer.  Payment will be in October."  Bonus Memos.  She also points

to her paystubs from years past, indicating that she received bonuses totaling $1,165 in 2010 and

$400 in 2011.  2010 and 2011 Paystubs (Exs. F and G to Pl. Resp.).  Stewart testified that bonuses

were "relatively rare, not a pretty regular occurrence," and they were offered by the owners of the

condos, not Defendant.  S. Brown Dep. 120-22.  Stewart also testified that any bonuses offered by the

owners "would never in a million years be in the quantity of $2,000.  We've never, in the existence

of the company, had a human being make that much money off of a bonus, ever."  S. Brown Dep. 120.

Plaintiff argues that she worked from January of 2012 through March of 2012 and, thus, is entitled

to the "equal bonus" mentioned in the January 14, 2012, memo.  However there is no evidence in

the record as to whether this bonus was ever paid out to any of the reservationists or, if it was, how

much was paid.  Plaintiff has failed to put forth sufficient evidence to create an issue of fact as to

whether she was entitled to any bonus at the time of her termination in March of 2012.  Therefore,

summary judgment is appropriate on Plaintiff's claim for violation of the SCPWA.

### D.    Breach of Contract and Breach of Contract with Fraudulent Intent

Plaintiff's file two causes of action are for breach of contract and breach of contract with

fraudulent intent.  Plaintiff alleges that Defendant breached a contract by failing to pay her the $2,000

bonus discussed above.  "The elements for a breach of contract are the existence of a contract, its

breach, and damages caused by such breach."  S. Glass & Plastics Co. v. Kemper, 399 S.C. 483,

491–92, 732 S.E.2d 205, 209 (Ct.App.2012). She appears to assert that the January 14, 2012, memo

constitutes a contract, which Defendant has breached.  For a contract to be binding, there must be a

mutual manifestation of assent between the parties as to the terms of the contract. Edens v. Laurel Hill,

Inc., 271 S.C. 360, 247 S.E.2d 434 (1978). Certain terms, such as price, time and place, are considered

indispensable and must be set out with reasonable certainty. Id. Where a contract does not fix a definite

price, there must be a definite method for ascertaining it. Id. The January 14, 2012, memo does not specify any particular terms that must be met by plaintiff or any other reservationist to obtain a bonus[10], nor does it fix a definite price for the amount of the bonus. It includes no definite method for ascertaining what the amount of the bonus would be. The evidence in the record is insufficient to establish the existence of a contract between Defendant and Plaintiff for the payment of a bonus. Therefore, summary judgment is appropriate on both the breach of contract and breach of contract with fraudulent intent causes of action.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendants' Motion for Summary Judgment (Document # 50) be denied as to Plaintiff's hostile work environment claim and retaliation claim and granted as to all other claims.


                    s/Thomas E. Rogers, III
                    Thomas E. Rogers, III
                    United States Magistrate Judge

May 20, 2016
Florence, South Carolina

---

[10]Although the memo states "this is our time to focus on reservations," making reservations was the main part of Plaintiff's job responsibility. Pl. Dep. 31-32 ("Q. What were you hired to do? A. Reservations."); S. Brown Dep. 73. The necessary elements of a contract are offer, acceptance, and valuable consideration. Sauner v. Pub. Serv. Auth. of S.C., 354 S.C. 397, 406, 581 S.E.2d 161, 166 (2003). Valuable consideration may consist of " some right, interest, profit or benefit accruing to one party or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." Prestwick Golf Club, Inc. v. Prestwick Ltd. P'ship, 331 S.C. 385, 389, 503 S.E.2d 184, 186 (Ct.App.1998). A promise by a party to do something she is already obligated to do is not valid consideration. City of Spartanburg v. Spartan Villa, 273 S.C. 1, 253 S.E.2d 501, 503 (1978).